(85 South. 906)

No. 22659.

THARP–BULTMAN–SONTHEIMER CO. v.
THARP–SONTHEIMER–THARP,
Inc., et al.

(June 30, 1920.)

*(Syllabus by the Court.)*

1. **Trade-marks and trade-names** &#10132;73(1)—
**One can use own name, but not in manner
to mislead public in accepting his goods as
those of another.**

The weight of jurisprudence in this country
sustains the doctrine that, in the absence of a
contract restricting the exercise of such right
(and the capacity for such restriction is lim-
ited), every one may use his own name honestly
in his own business and in the earning of his
own livelihood and that of his family, but that
no one may lawfully resort to artifice or deceit
for the purpose, or with the intent and effect
of misleading, or confusing the public and
palming off his services, goods, or products as
those of another.

2. **Corporations** &#10132;49(1)—**Statute relating to
corporate name held not to affect rule against
use of name to mislead public.**

Act No. 267 of 1914 contains nothing in
conflict with the doctrine so stated.

Appeal from Civil District Court, Parish of
Orleans; Porter Parker, Judge.

Suit for injunction by Tharp-Bultman-
Sontheimer Company against Tharp-Sont-
heimer-Tharp, Incorporated, and others.
Judgment for defendants, and plaintiff ap-
peals. Affirmed.

Dart, Kernan & Dart, of New Orleans, for
appellant.

Lazarus, Michel & Larazus, of New Orleans
(Herbert S. Weil, of New Orleans, of counsel),
for appellees.

### Statement of the Case.

MONROE, C. J. Plaintiff company prays
for an injunction, prohibiting the defendant
corporation, and Henry Tharp, Isaac Sont-
heimer, Morris B. Sontheimer, Mar N. Koh-
ler, and A. S. Tharp, and each of them, from
using the name Tharp-Sontheimer-Tharp, In-
corporated, or anything like or similar there-
to, and from carrying on, in that name, the
same business as that conducted by it, cer-
tain prior relations between them being set
forth, and it being further alleged that the
business and purposes of the defendant com-
pany are identical with those of plaintiff;
"that the adoption * * * of the name
'Tharp-Sontheimer-Tharp' for the corporation
carried on by defendant is in violation of
paragraph (a) of section 2 of Act 267 of 1914,
* * * which forbids any corporation to
adopt a name similar to one already in exist-
ence or one so similar as to cause confusion
with the name of any other domestic or for-
eign corporation admitted to do business in
this state, * * * that the name Tharp-
Sontheimer-Tharp, Incorporated, was adopt-
ed, and is being used fraudulently, and with
the unlawful and fraudulent intention and
attempt to palm off their [defendant's] serv-
ices, goods and business upon the public as
the services, goods and business of your peti-
tioner; * * * that in pursuance of the
said unlawful and fraudulent intention
and purpose the said defendants have
used all means within their power to confuse
the public and to cause the public to believe
that, in calling upon them for services, they
are dealing with your petitioners."

There are further allegations of damages,
with reservation of the right to sue there-
for, and right to an injunction, and a prayer
that the writ be issued and perpetuated.

The facts disclosed by the evidence are,
substantially, as follows: As far back as
1883, A. F. Bultman was engaged in business
in New Orleans as an undertaker, or under-
taker and liveryman, and he so continued
until about 1904, when he took his son, A.
F. Bultman, Jr., into partnership with him.
Between the years stated and prior to 1883
the firm of F. Johnson & Son Company,
Limited, "was engaged in the same business,

and as early as 1889 Henry Tharp was employed by it, becoming its manager as early, perhaps, as 1902, and so continuing until 1919, during which period he became so widely known and highly esteemed that his name and personality were regarded as valuable assets, and he was insistently urged by the Bultman firm to unite with them in business, which he finally consented to do; and on April 29, 1909, they and he and Alexander Maxwell entered into an agreement to incorporate themselves under the name of Maxwell-Tharp-Bultman Company; to purchase the business and assets of the Maxwell Co., Limited, a corporation of which Alexander Maxwell was president and owner, or representative of the owners, and which was engaged in the same business; and to give their support to the new company; Tharp's active connection therewith to begin not later than June 1, 1909. On May 3 following, there was a separate agreement between Tharp and the Bultmans, to the effect that he was to serve the new corporation (which was thereafter organized), as manager and secretary, for a term of 2½ years, at a salary of $175 per month; and if the business proved successful was, at the end of that period, to receive $200 per month, be "given" 15 shares of the stock of the company of the par value of $100 each, with the option of purchasing an additional 25 shares; and if the business proved unsuccessful was then to be continued in the employ of A. F. Bultman & Son (which, as it seems, was to continue as a distinct entity and separate establishment), at a salary of $150 per month, but with no interest in the firm. The Maxwell-Tharp-Bultman Company was incorporated on May 17, 1909, enjoyed a prosperous business life of 2 years, and, Maxwell having dropped out, was succeeded by a corporation organized as Tharp-Bultman Company, of which Tharp and the two Bultmans were the sole members, with A. F. Bultman, Jr., as president, Tharp as secretary, and A. F. Bultman, Sr., as treasurer. That corporation also prospered for 15 months, during which period (on April 29, 1911) it bought the business and assets of F. Johnson & Son Company, at the end of which, on July 18, 1912, it bought the assets of A. F. Bultman & Son, and on July 27, 1912, took over, by agreement the undertaking establishment of I. Sontheimer & Son, the members of which firm became stockholders in the company and two of the three (Isaac and Morris B. Sontheimer) employés, it being part of the agreement that the name of the corporation should be changed to that of Tharp-Bultman-Sontheimer Company, and that one of the Sontheimers should be a director, and on August 30, 1912, the name was changed accordingly. Thereafter for several years the corporation prospered, as its predecessors had done, but early in 1916 some friction arose between the members, and in July, 1916, Tharp and the two Sontheimers bought the undertaking and livery business and assets of S. D. Norwood, Incorporated, and on August 1, 1916, severed their connections with Tharp-Bultman-Sontheimer Company; took in A. S. Tharp, son of Henry Tharp; changed the name of the Norwood corporation to that of Tharp-Sontheimer-Tharp, Incorporated, and immediately advertised their withdrawal from Tharp-Bultman-Sontheimer Company, and the establishment of the new company, in each of the daily papers published in New Orleans, during a period of 3 months, at a cost of $481.51. They also sent out several thousands of announcements to the same effect, and did all that could reasonably have been expected, and more, to show that it was not their intention or desire to "confuse the public and to cause the public to believe that, in calling upon them for services, they were dealing with the petitioners" herein, or to do any other of the objectionable things with which they are charg-

ed in the petition; and the evidence in the case entirely fails to sustain those charges. The plaintiff company was unable to show a single instance in which, by reason of the similarity of names or otherwise, any business had been directed to defendant to which it had a shadow of a claim; and the instances in which during the, say, 2½ months preceding the institution of this suit errors were committed in the delivery of mail or merchandise were so few and unimportant as to be negligible, though it can be readily understood that the very many changes which had taken place in the name, or names, under which the different parties had been operating may have attracted some attention. It is shown, however, that the Tharps, Sontheimers, and Bultmans (fathers and sons) have been engaged, in their own names, respectively, in the undertaking and livery business in New Orleans for many years; that they have, respectively, large circles of acquaintances, to whom they may reasonably look for, and from whom they, in fact, obtain, patronage; and, as to the Tharps and Sontheimers, that they are dependent upon that patronage for the maintenance of themselves and their families. The business in question is, as we infer, almost exclusively local, and it is shown to be further peculiar, in that, in the vast majority of instances, it is transacted between people who know with whom they are dealing, and are unlikely to fall into any error in that respect. In other words, it is in the highest degree improbable that a person intending to order a funeral from a Bultman would give the order to a corporation in which that name does not appear, and of which no Bultman is a member, and not probable, though possible, that a person intending to order a funeral from a Tharp or a Sontheimer would give it to a corporation of which no Tharp or Sontheimer is a member, even though the style of the corporation may include both

names; for, in association with the question of personality, the place where the business is located has rather an important bearing in the minds of local patrons as identifying those by whom the business is conducted, and those seeking a particular undertaker are not likely to go or to telephone to the place of business of another in order to find him. In the matter, however, of both name and place of business, if any advantage is to be derived from misleading indications, it is all in favor of plaintiff, since it is not only using the names of Tharp and Sontheimer though no one bearing either of those names is connected with it, but it continues to occupy the place of business with which Tharp has long been identified, whereas, defendant is established at a place where, so far as appears from the record, no Bultman has ever been located.

In conclusion of this statement, it may be remarked that the various contracts and acts of incorporation to which we have referred contain nothing from which the inference could be drawn that either Tharp or the Sontheimers were not entirely free to withdraw from the business of Tharp-Bultman-Sontheimer Company at the time that they took that action, and were not free to make legitimate use of their own names to earn livelihoods for themselves and families.

### Opinion.

[1, 2] The weight of jurisprudence in this country sustains the doctrine that, in the absence of a contract restricting the exercise of such right (and the capacity for such restriction is limited), every one may use his own name honestly, in his own business, and in the earning of his own livelihood and that of his family, but no one may lawfully resort to artifice or deceit for the purpose, or with the intent and effect of misleading or confusing the public and palming off his services, goods, or products as that of

another. Peck Brothers & Co. v. Peck Brothers Co., 113 Fed. 291, 51 C. C. A. 251, 62 L. R. A. 81; Young & Chaffe Furniture Co. v. Chaffee Bros. Furniture Co., 204 Mich. 293, 170 N. W. 48; Title & Mortgage Guarantee Co., Limited, v. Louisiana Abstract & Title Guarantee Co., 143 La. 894, 79 South. 529; Vonderbank v. Schmidt, 44 La. Ann. 264, 10 South. 616, 15 L. R. A. 462, 32 Am. St. Rep. 336; Bergamini v. Bastian, 35 La. Ann. 60, 48 Am. Rep. 216. Having found, in this case, that defendants have used their names only as they had the legal and moral right to use them, we conclude that they have not violated Act 267 of 1914, have given plaintiff no just cause of complaint, and that this suit was properly dismissed by the trial judge.

The judgment appealed from is therefore affirmed.